## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | Case No. 08-03594 |
| CASA DE CAMBIO MAJAPARA | ) | |
| S.A. DE C.V., | ) | Hon. Rebecca R. Pallmeyer |
| Debtor. | ) | |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ | ) | |
| | ) | |
| WACHOVIA BANK, N.A. | ) | |
| | ) | |
| Appellant, | ) | Appeal from U.S. Bankruptcy Court |
| v. | ) | for the Northern District of Illinois |
| | ) | Case No. 08-5230 |
| CASA DE CAMBIO MAJAPARA | ) | |
| S.A. DE C.V. | ) | |
| | ) | |
| Appellant | ) | |
| | ) | |

## <u>APPELLANT WACHOVIA BANK, N.A.'S OPENING BRIEF</u>

Pia N. Thompson (ARDC No. 6225746)
Michael S. Leib (ARDC No. 6243348)
Reed Smith LLP
10 South Wacker Drive, 40th Floor
Chicago, IL  60606-7484
Telephone:     (312) 207-1000
Facsimile:     (312) 207-6400
Email: mleib@reedsmith.com

## TABLE OF CONTENTS

Table of Authorities Cited ....................................................................................... ii

Basis for Appellate Jurisdiction ............................................................................. 1

Issue Presented and Standard of Appellate Review............................................... 1

Issue Presented........................................................................................................ 1

Applicable Standard Of Review ............................................................................. 1

Statement of the Case.............................................................................................. 4

Nature of the Case, the Course of Proceddings and Disposition in the Course Below ................. 4

Statement of the Facts Relevant to the Issues Presented ....................................... 5

Background on the Debtor ....................................................................................... 5

The Relationship Between The Debtor And Wachovia............................................ 6

The Debtor Files A U.S. Bankruptcy...................................................................... 8

Mexican Regulator Files A Bankruptcy Proceeding In Mexico ............................ 9

Argument ............................................................................................................... 10

Summary ................................................................................................................ 10

Dismissal is the Best Interest of Creditors and the Debtor .................................. 11

Allowing Majapara to Continue its Chapter 11 Case Defies Congressional Intent to Have Cross-Border Insolvencies Coordinated from the Debtor's Home Jurisdiction.................................... 20

Majapara's Actions Circumvent the Rights of Mexican Regulatory Authorities......................... 21

Conclusion ............................................................................................................. 23

## <u>TABLE OF AUTHORITIES CITED</u>

**Cases**

<u>Cunard S.S. Co. v. Salen Reefer Servs. AB</u>, 773 F.2d 452, 458 (2d Cir. 1985)............................ 20

<u>Gonzalez v. Chrysler Corp.</u>, 301 F.3d 377 (5th Cir. 2002)............................................................ 13

<u>In re 801 South Wells Street Ltd. P'ship</u>, 192 B.R. 718 (Bankr. N.D. Ill. 1996) ......................... 12

<u>In re Bailey's Beauticians Supply Co.</u>, 671 F.2d 1063 (7th Cir. 1982) ......................................... 3

<u>In re Compañia de Alimentos Fargo, S.A.</u>, 376 B.R. 427 (Bankr. S.D.N.Y. 2007) ............... 12, 19

<u>In re Dash</u>, No. 92 C 7870, 1993 WL 169272, (N.D. Ill. May 18, 1993)........................................ 2

<u>In re Edwards</u>, 214 B.R. 613 (B.A.P. 9th Cir. 1997) ....................................................................... 2

<u>In re Hatfield</u>, Nos. C-07-3715, C-07-3716, 2008 WL 906505, (N.D. Cal. Mar. 31, 2008) .......... 3

<u>In re Mazzocone</u>, 200 B.R. 568 (E.D. Pa. 1996) ............................................................................ 1

<u>In re Parklane/Atlanta Joint Venture</u>, 927 F.2d 532 (11th Cir. 1991) ............................................ 2

<u>In re Repository Techs., Inc.</u>, 381 B.R. 852 (N.D. Ill. 2008)...................................................... 1, 4

<u>In re Xacur</u>, 219 B.R. 956 (Bankr. S.D. Tex. 1998) ......................................................... 12, 18, 20

<u>International Zinc Coatings & Chem. Corp.</u>, 355 B.R. 73 (Bankr. N.D. Ill. 2006)........................ 12

<u>Northern Pipeline Construction Co. v. Marathon Pipe Line Co.</u>, 458 U.S. 50 (1982) ................... 2

<u>Pullman-Standard v. Swint</u>, 456 U.S. 273 (1982)........................................................................... 4

**Statutes**

11 U.S.C. § 105................................................................................................................................ 1, 4

11 U.S.C. § 109................................................................................................................................ 1, 4

11 U.S.C. § 1112(b) ..................................................................................................................... 1, 4, 5

11 U.S.C. § 1511................................................................................................................................. 14

11 U.S.C. § 1512................................................................................................................................. 14

11 U.S.C. § 1517 .................................................................................................... 14, 16

11 U.S.C. § 1529 ......................................................................................................... 20

11 U.S.C. § 305(a) ................................................................................................. passim

11 U.S.C. § 546(g) .............................................................................................. 8, 15, 19

11 U.S.C. §§ 1501-1532 ............................................................................................. 14

28 U.S.C. § 158(a)(3) ................................................................................................... 1

Fed. R. Bankr. P. 8001(b) ............................................................................................ 1

Fed. R. Bankr. P. 8003(c) ............................................................................................ 1

**Other References**

House Report No. 109-31 (I), at 117 (2005) ......................................................... 20, 21

Judicial Improvements Act of 1990, Pub. L. No. 101-650, § 309, 104 Stat. 5089 ......................... 3

## BASIS FOR APPELLATE JURISDICTION

Once this Court grants leave to appeal, the Court has appellate jurisdiction under 28 U.S.C. § 158(a)(3) and Rules 8001(b) and 8003(c) of the Federal Rules of Bankruptcy Procedure. This matter is an appeal from the Bankruptcy Court's May 8, 2008 denial of Motion of Wachovia Bank, National Association for an Order Dismissing Debtor's Chapter 11 Bankruptcy Case Pursuant to Sections 105, 109, 305 and 112(b) of the Bankruptcy Code. (DN 122.)

## ISSUE PRESENTED AND STANDARD OF APPELLATE REVIEW

### *Issue Presented*

Whether the Bankruptcy Court erred by denying Wachovia Bank, National Association's ("Wachovia") Motion for an Order Dismissing Debtor's Chapter 11 Bankruptcy Case under 11 U.S.C. §§ 105 and 305, where the Debtor is a highly-regulated Mexican financial institution with extremely limited assets and no physical operations in the United States, the overwhelming majority of its creditors are in Mexico, it is subject to an insolvency proceeding in Mexico filed by its governmental regulators, and where the Chapter 11 case contravenes United States policy, as set forth in Chapter 15 of the Bankruptcy Code.

### *Applicable Standard Of Review*

On appeal, a District Court generally reviews a bankruptcy court's findings of fact for clear error and reviews questions of law and mixed questions of law and fact *de novo*. See In re Repository Techs., Inc., 381 B.R. 852, 857 (N.D. Ill. 2008). While most courts reviewing decisions on motions to dismiss under 11 U.S.C. § 305(a) have applied an abuse of discretion standard, a few courts have reviewed such decisions *de novo*. Compare In re Mazzocone, 200 B.R. 568, 571-72 (E.D. Pa. 1996) (applying an "abuse of discretion" standard on review of an order dismissing a bankruptcy case under § 305(a)) with In re Edwards, 214 B.R. 613, 618

(B.A.P. 9th Cir. 1997) (applying a *de novo* standard of review where the facts were established and the decision represented a mixed question of law and fact). In this District, the standard to be applied is no clearer, as the only case Wachovia has found in which a court stated the standard it was using in reviewing a bankruptcy court's decision under § 305(a) was an unpublished decision that applied an abuse of discretion standard without any analysis or citations supporting this standard. See In re Dash, No. 92 C 7870, 1993 WL 169272, at *1 (N.D. Ill. May 18, 1993).[1] Wachovia, however, believes that the proper standard of review is *de novo* review, especially given the circumstances of this case.

As originally enacted, 11 U.S.C. § 305(c) left decisions under § 305(a) solely to the bankruptcy judge and did not permit appellate review by any court. In order to put effect to the Supreme Court's decision in Northern Pipeline Construction Co. v. Marathon Pipe Line Co., 458 U.S. 50 (1982), which held unconstitutional a section of the Bankruptcy Act of 1978 that provided independent judicial power to non-Article III Bankruptcy Court judges, Congress modified Title 28 and the Bankruptcy Code in 1984 to reform bankruptcy jurisdiction, but made no changes regarding the unreviewability of § 305(a) decisions. After concern arose that the failure to modify § 305(c) conflicted with the Marathon decision, (see, e.g., In re Parklane/Atlanta Joint Venture, 927 F.2d 532, 538 (11th Cir. 1991) (noting that § 305(c) "place[d] the jurisdiction of an Article III court within the discretion of an Article I court" and that an order by a bankruptcy court under § 305(a) "would be an impermissible exercise of the judicial power of the United States by a non-Article III court"), in 1990, Congress amended § 305(c) to allow review by the District Court. See Judicial Improvements Act of 1990, Pub. L.

---

1 All unpublished decisions and references to public laws and house reports referred to in this brief are attached hereto as Exhibit 1.

No. 101-650, § 309, 104 Stat. 5089, 5113.  In doing so, Congress ensured that the District Court would have meaningful review over the Bankruptcy Court's decisions under § 305(a).

Surprisingly, in the years since the 1990 amendment, the majority of courts reviewing decisions under § 305(a) either fail to provide any analysis for the standard applied or continue to base their standard of review on inapplicable decisions issued before 1990.  See, e.g., In re Hatfield, Nos. C-07-3715, C-07-3716, 2008 WL 906505, at *2 (N.D. Cal. Mar. 31, 2008) (citing In re Bailey's Beauticians Supply Co., 671 F.2d 1063, 1067 (7th Cir. 1982)).  This reliance, however fails to recognize that, in 1990, Congress rejected the concept of a § 305(a) decision being left completely to the Bankruptcy Court without meaningful and effective review by an Article III judge.

In the case at hand, the Court made its decision based on a set of uncontested facts.  At oral argument, the parties stated as follows:

> Wachovia's counsel:  Your Honor, I don't know how you want to handle this. Quite frankly, from our perspective, this is probably an oral argument.  I do not think that there's likely to be any factual issues at stake in the decision.  If that arises, certainly we can address that.  But our belief was that this was likely to be just an oral argument.
>
> Debtor's counsel:  Your Honor, maybe this is a good sign, but I actually agree with [Wachovia's counsel].  I think that to the extent there are factual disagreements, they're really non-material to today's dispute.  There may be a time and place to have them addressed before this court, but this is neither the time, and at least today not the place.  So I would agree, unless the court in the course of our argument finds something that it believes is a factual issue, that we are really not disputing the principal facts nor are – you know, nor are either one of us, sounds like, preparing to present witnesses simply for the sake of presenting them.

(See TN 30 (5/7/08 transcript), at 3:25 – 4:19.)[2]  Because the decision was based on uncontested

---

2  Citations to "DN" are references to the Docket Number in the Bankruptcy Court for the Northern District of Illinois.  Citations to "TN" are references to the Tab Numbers identified in Wachovia's Designation of Appellate Record.

facts, the decision was either a mixed question of law and fact or a pure question of law or both.

See Pullman-Standard v. Swint, 456 U.S. 273, 290 n.19 (1982) (defining a mixed question of law and fact as one "in which the historical facts are admitted or established, the rule of law is undisputed, and the issue is whether the facts satisfy the statutory standard.")  As stated above, the law in this District is that review of a Bankruptcy Court's decision on a mixed question of law and fact or a pure question of law is *de novo* review.  See Repository Techs., 381 B.R. at 857.  Given Congress's 1990 amendment vesting the power to review § 305(a) decisions with this Article III Court, and given that the question to be reviewed is either a mixed question of law and fact or a pure question of law or both, the proper standard of review is *de novo* review.

## STATEMENT OF THE CASE

### NATURE OF THE CASE, THE COURSE OF PROCEEDINGS AND DISPOSITION IN THE COURSE BELOW

The Debtor, Casa de Cambio Majapara S.A. de C.V. ("Majapara" or "Debtor"), a Mexican currency exchange company, filed a Chapter 11 bankruptcy in the United States.  On March 24, 2008, Majapara's largest creditor, Wachovia, moved to dismiss the case pursuant to 11 U.S.C. §§ 105, 109(a), 305, and 1112(b) on the grounds that:  (a) there is no legitimate basis for the administration of a bankruptcy in the United States where the Debtor is a highly-regulated Mexican financial institution with extremely limited assets and no physical operations in the United States, the overwhelming majority of its creditors are in Mexico, and it is subject to an insolvency proceeding in Mexico filed by its Mexican governmental regulators; and (b) the Debtor filed the Chapter 11 in bad faith.  (DN 19, 20, 22.)  The Debtor filed its response brief on April 22, 2008, (DN 95, 96), with Wachovia filing its reply brief on April 30, 2008.  (DN 117.)

On May 8, 2008, after hearing oral argument on the Motion to Dismiss, (see TN 30 (5/7/08 transcript)), the Bankruptcy Court denied Wachovia's Motion to Dismiss.  (DN 122.)

Wachovia then filed this appeal, which is based solely on 11 U.S.C. §§ 105 and 305 and not on bad faith under 11 U.S.C. § 1112(b).

## STATEMENT OF THE FACTS RELEVANT TO THE ISSUES PRESENTED

### *Background on the Debtor*

Majapara is a Mexican currency exchange bureau (*casa de cambio*) who engages in foreign exchange transactions[3] and allegedly the purchase and sale of items such as bill payment orders, checks and drafts in foreign currencies.  (DN 95, at 4.)  According to Majapara, it began to operate in 1989 and, by December 2007, "had over 600 employees and offices throughout Mexico."  (Id.)

In Mexico, currency exchanges are designated under law as Foreign Exchange Brokers, which are subject to specific laws and strict regulation by several Mexican governmental entities. (DN 22, Ex. E, ¶¶ 8-9.)  Specifically, as a Mexican Foreign Exchange Broker, Majapara is considered an Ancillary Financial Institution and its business is governed by the *Ley General de Organizaciones y Actividades Auxiliares del Crédito* (the "General Law of Ancillary Financial Organizations and Activities" or "GLAFOA").  (Id., ¶¶ 9, 12.)  The GLAFOA imposes numerous requirements on Ancillary Financial Institutions, including, for example, regulatory authorization to operate, minimum capitalization requirements, restrictions on ownership of stock, and prior approval of charters of incorporation.  (Id., ¶ 12.)  Foreign Exchange Brokers, as a subset of Ancillary Financial Institutions, are further restricted by the GLAFOA in that a Foreign Exchange Broker cannot, *inter alia*, receive bank deposits, place surety bonds, purchase real

---

3 In general, a foreign exchange transaction is a transaction in which one party agrees to deliver an agreed amount of one currency to a second party in exchange for the second party agreeing to deliver an agreed amount of a different currency to the first party.

estate beyond their operational needs, or otherwise conduct transactions that are not expressly authorized by the GLAFOA.  (Id., ¶ 27.)

Majapara, like other Ancillary Financial Institutions, is subject to strict oversight by the Ministry of Finance and Public Credit (the "SHCP"), the Mexican Central Bank ("BANXICO"), and the Mexican National Banking and Securities Commission (the Mexican *Comisión Nacional Bancaria y de Valores* or the "CNBV").  (DN 22, Ex. E, ¶ 11.)  For example, as a regulated entity rendering services of public interest, Majapara must comply with, *inter alia*, the following special requirements:  (i) it must maintain minimum equity capital as established in the first quarter of each year by the SHCP, upon consideration of opinions from the CNBV and BANXICO; (ii) foreign governments or foreign government corporations or agencies may not participate as shareholders, but foreign financial institutions and, generally, foreign investors may participate as shareholders provided that, at all times, Mexican investors control the entity; (iii) subject to certain exceptions, no person or corporation, directly or indirectly, may hold or control more than ten percent (10%) of the capital stock; (iv) the board must have at least five members; (v) shareholder and board meetings must be held in the domicile of the corporation which must always be in Mexico; (vi) in order to verify consistency with the GLAFOA, the charter of incorporation and any modification thereto is subject to prior approval by the SHCP. (Id., ¶ 12; DN 117, Ex. E2, Arts. 8 and 82.)

### *The Relationship Between The Debtor And Wachovia*

Over the course of many years, Majapara and Wachovia entered into many foreign exchange spot transactions (spot transactions are foreign exchange transactions in which the transaction is required to settle within two business days).  This relationship, however, came to an end in December 2007.

On December 5, 2007, Wachovia and Majapara agreed to a series of seven foreign exchange spot transactions that were to close on December 7, 2007.  (DN 20, Ex. B, ¶ 6.)  In other words, the parties agreed on December 5, 2007 to exchange set amounts of different currencies on December 7, 2008.  Pursuant to the parties' agreement, on December 7, 2007, Wachovia delivered €26,000,000 (Euros) to Majapara.  (Id. ¶ 7.)  Majapara, however, never delivered the required $38,132,700 (US$) to Wachovia and it did not return the €26,000,000 (Euros) Wachovia provided to it.  (Id. ¶ 8.)

In an effort to recover the monies Majapara owed it, on December 14, 2007, Wachovia initiated attachment proceedings in Illinois State Court (the "Illinois Action").[4]  (DN 20, Exs. A and B.)  Pursuant to these efforts, the Illinois Court entered an Order of Attachment on December 14, 2007 and a Supplemental Order of attachment on December 17, 2007, ordering the attachment of funds in the possession of Harris N.A. d/b/a Harris Bank.  (Id., Ex. C.)  The approximate balance on the Harris Bank account as of December 17, 2008 was $1.65 million (the "Harris Bank Account").  (TN 33 (Amended Ans. to Adv. Compl.), ¶ 7.)

On December 14, 2007, Wachovia also initiated attachment proceedings in the United States District Court for Southern District of New York (the "New York Action"), (TN 33, ¶ 12), and, on December 20, 2007, the Court issued an order granting Wachovia's application for prejudgment attachment.  (DN 21, Ex. B.)

---

4 The Illinois Action was subsequently removed to the United States District Court for the Northern District of Illinois (before the Honorable Amy J. St. Eve).  Wachovia's motion to remand the Illinois Action back to the Illinois State Court was denied, without prejudice, due to Majapara's filing for bankruptcy.

### *The Debtor Files A U.S. Bankruptcy*

As a result of its financial problems, Majapara decided to file for bankruptcy.  But rather than filing for insolvency in Mexico, Majapara decided to file a Chapter 11 petition in the United States in an effort to avoid as a preference Wachovia's prejudgment attachment over the Harris Bank Account.  (DN 95, at 8-9.)  To this end, on March 5, 2008, Majapara filed a Chapter 11 petition in the United States Bankruptcy Court for the Northern District of Illinois.  (DN 1.)  Majapara then filed an adversary proceeding against Wachovia seeking a declaration that the prejudgment attachments were preferences.  (DN 21.)

In response to the Adversary Complaint, Wachovia filed an answer in which it asserted that, regardless of whether or not Majapara can prove the general requirements for avoidance, the prejudgment attachments are exempt from avoidance under the safe-harbor provision of 11 U.S.C. § 546(g).  (TN 33 (Amended Ans. to Adv. Compl.), Affirmative Defense 1.)  Section 546(g) specifically states that a "transfer" made "in connection with" a "swap agreement" may not be avoided.  11 U.S.C. § 546(g).  Since the parties agree that foreign exchange spot transactions are "swap agreements," and since the parties agree the attachments were obtained "on account of" the debt Majapara owes to Wachovia under the foreign exchange spot transactions, (DN 21, ¶¶ 18, 27; TN 33, ¶¶ 18, 27), the attachments are exempt from avoidance. (TN 33, Affirmative Defense 1.)  And the Bankruptcy Court agrees.  On July 9, 2008, the Bankruptcy Court granted Wachovia's Motion for Summary Judgment and held that, pursuant to Section 546(g), the prejudgment attachments are exempt from avoidance.  As such, the Court will be entering Judgment in favor of Wachovia on all Counts of Majapara's Adversary Complaint.

*Mexican Regulator Files A Bankruptcy Proceeding In Mexico*

Because Majapara failed to file an insolvency petition in Mexico, soon after Majapara filed its Chapter 11 Petition, the CNBV (the Mexican National Banking and Securities Commission) filed its own complaint in Mexico seeking the involuntary business reorganization of Majapara, which was admitted by the Mexican court on April 4, 2008.  (DN 22, Ex. F, ¶ 61-62; DN 117, Ex C, ¶¶ 18-22.)  That case will be governed by the *Ley de Concursos Mercantiles* (the "Mexican Business Reorganization Act" or the "MBRA").  (DN 22, Ex. E, ¶ 28; DN  22, Ex. F, ¶ 13.)

Although the procedures of the MBRA for voluntary and involuntary filings for reorganization or liquidation in Mexico apply generally to commercial entities, (see generally DN 22, Ex. F, ¶¶ 11-48), the MBRA has special provisions for certain regulated financial institutions such as Majapara.  (See generally id., ¶¶ 49-55.)  For example, if the case starts in the reorganization phase, the CNBV has the sole and exclusive right to propose the appointment, removal, or substitution of a conciliator to oversee the reorganization of the Debtor and to manage the negotiations with the creditors.  (DN 22, Ex. E, ¶ 37; DN 22, Ex. F, ¶¶ 25, 41, 54; DN 117, Ex. E1, Art. 259.)  If the case starts in the liquidation phase, or if reorganization is not successful, the CNBV has the sole and exclusive right to propose the appointment, removal, or substitution of a trustee to run and liquidate the Debtor.  (DN 22, Ex. E, ¶ 37; DN 22, Ex. F, ¶¶ 25, 41, 54; DN 117, Ex. E1, Art. 259.)  The CNBV also has the power, in the interests of the creditors, to compel the judge to open the case in the liquidation phase or to terminate the reorganization stage early and move to the liquidation phase.  (DN 22, Ex. F, ¶ 53; DN 117, Ex. E1, Art. 258.)  In addition, the Mexican Commission for the Defense and Protection of the Financial Services Users ("CONDUSEF"), whose main purpose is to promote, counsel, protect

- 9 -

and defend the rights and interests of the customers of Mexican financial institutions, has the power to appoint up to three intervenors who are required to protect and represent the rights and interests of the creditors of the Foreign Exchange Broker in business reorganization.  (DN 22, Ex. E, ¶ 38; DN 22, Ex. F, ¶ 55; DN 117, Ex. E1, Art. 260.)

Despite these regulations, rather than filing for insolvency in Mexico, Majapara filed for bankruptcy in the United States and is now petitioning the Mexican court to recognize the CNBV's Mexican insolvency case as ancillary to the United States bankruptcy.  (DN 95, Ex. C, ¶ 7.)  The Mexican Court has not yet ruled on Majapara's petition.

## ARGUMENT

### I.    SUMMARY

Majapara is a highly-regulated Mexican entity, with all of its physical operations, real estate and the overwhelming majority of its creditors in Mexico.  These facts are undisputed.  Nevertheless, rather than filing an insolvency proceeding in Mexico, where the overwhelming majority of its creditors could participate and be heard, Majapara filed for Chapter 11 protection in the Northern District of Illinois.

But by filing in the United States, Majapara has orchestrated a procedural and administrative nightmare to the detriment of creditors and the Debtor itself.  As will be discussed below, if this case is not dismissed, instead of a main Mexican insolvency case and a United States proceeding ancillary thereto, it is highly likely that there will continue to be two main bankruptcy proceedings (as there are now), one in Mexico and one in the United States, each acting independent from the other.  Such a result would prevent the efficient coordination between the courts contemplated by the Model Law on Cross-Border Insolvency, which was incorporated as Chapter 15 to the Bankruptcy Code in 2005 and adopted by Mexico in 2000.  This will increase fees and costs for both the Debtor and creditors, who will have to participate in

two cases or risk being excluded from a distribution in one of the jurisdictions, and will likely result in inconsistent rulings and possibly an inequitable distribution of assets.

Additionally, the Chapter 11 case contravenes United States policy as enacted in Chapter 15. Chapter 15 contemplates the United States acting ancillary to a Mexican case in a situation where the debtor is Mexican and has no physical operations in the United States. The reason for that policy is evident. In a bankruptcy, there can be many ancillary proceedings all over the world if the debtor has assets in many countries. For a country such as the United States to coordinate ancillary proceedings all over the world where the Debtor is a Mexican entity with no physical operations in the United States and with 99% of its creditors being Mexican is improper and simply makes no sense. Indeed, the Debtor's home country is the proper jurisdiction for the main proceeding and the Mexican courts are the proper courts to coordinate such ancillary proceedings. This is especially true here, where Mexican regulators have special rights that would be circumvented if the Chapter 11 case is allowed to continue.

For these and the other reasons discussed below, the Court should reverse the Bankruptcy Court's decision to deny Wachovia's motion to dismiss.

## II.    DISMISSAL IS IN THE BEST INTEREST OF CREDITORS AND THE DEBTOR

While the protections afforded by the Bankruptcy Code are broad, they are not without limit. Indeed, these protections were never meant to be so expansive as to apply to Majapara, a highly-regulated foreign financial entity with all of its employees, offices, management, and virtually all of its assets in Mexico.

Section 305(a)(1) of the Bankruptcy Code permits a court to dismiss a bankruptcy case if the interests of creditors and the debtor would be better served by such dismissal. See 11 U.S.C. § 305(a)(1). Whether a court dismisses a bankruptcy case pursuant to Section 305(a)(1) is a fact sensitive determination, and, among other factors, a court may consider the following:

(1) economy and efficiency of administration; (2) whether another forum is available to protect the interests of both parties or there is already a pending proceeding in state court; (3) whether federal proceedings are necessary to reach a just and equitable solution; (4) whether there is an alternative means of achieving an equitable distribution of assets; (5) whether the debtor and the creditors are able to work out a less expensive out-of-court arrangement which better serves all interests in the case; (6) whether a non-federal insolvency has proceeded so far in those proceedings that it would be costly and time consuming to start afresh with the federal bankruptcy process; and (7) the purpose for which bankruptcy jurisdiction has been sought.[5]

In re 801 South Wells Street Ltd. P'ship, 192 B.R. 718, 723 (Bankr. N.D. Ill. 1996) (dismissing an involuntary case where the case was filed against the debtor by junior mortgagees in bad faith in an effort to halt senior mortgagee's foreclosure action); see also International Zinc Coatings & Chem. Corp., 355 B.R. 73, 82 (Bankr. N.D. Ill. 2006). Since "[d]eference to foreign insolvency proceedings will, in many cases, facilitate 'equitable, orderly and systematic' distribution of the debtor's assets," (In re Compañia de Alimentos Fargo, S.A., 376 B.R. 427, 434 (Bankr. S.D.N.Y. 2007) (citations omitted)), "[w]here the bankruptcy court is asked to abstain in favor of a foreign proceeding," the question of whether "the foreign forum will determine and adjust the parties' rights in a fair and equitable manner . . . is of paramount importance." Id. at 434-35. If that test is satisfied, "the court must weigh the relative benefits and burdens of exercising its jurisdiction." Id. at 435.

Here, in light of the fact that an insolvency case is pending in Mexico, there is no doubt that another forum exists to protect the interests of all parties. In fact, at least one court has found that Mexican bankruptcy courts are competent to hear bankruptcy and insolvency matters involving Mexican corporations. See In re Xacur, 219 B.R. 956, 969-70 (Bankr. S.D. Tex. 1998) (finding Mexico to be an "adequate alternative forum" for a bankruptcy); Cf. Gonzalez v.

---

5 The factors to be considered in connection with a Section 305(a)(1) analysis are not jurisdictional and have no bearing on whether Illinois courts may exercise personal jurisdiction over Majapara.

Chrysler Corp., 301 F.3d 377, 383-84 (5th Cir. 2002) (finding Mexico an adequate forum in non-bankruptcy context).  Majapara did not claim otherwise in the lower court.  (See DN 95, Ex. C, ¶ 4 (noting that Majapara hired Mexican counsel in late-December 2007 or early-January 2008 and considered filing insolvency proceedings in Mexico).)  Furthermore, as will be discussed below, the burden imposed on creditors and the Debtor by the exercise of jurisdiction by the United States far outweighs any benefit they could achieve from the Chapter 11 case.

The basic facts regarding Majapara are undisputed.  Majapara is a highly-regulated Mexican foreign exchange broker with its principal place of business at Lago Margarita No. 16, Colonia Granada, C.P. 11520, Mexico, D.F.  (DN 1.)  Majapara has no offices, real estate or employees in the United States.  (See TN 17 (4/16/08 transcript), at 12:3 – 12:5 ("Q:  Is there any business locations in the United States?  A:  No."); DN 76, Schedule A (identifying all of Majapara's real estate as being in Mexico).)  Majapara is not licensed to do business in the United States, (TN 17, at 13:21 – 13:24), and only a handful of its between 1,000 and 5,000 creditors are in the United States.  (See DN 1 (estimating the number of creditors at between 1,000 and 5,000); DN 110, Schedule F, incl. Exhibits F-1, F-2 and F-3 (identifying addresses of each of the creditors).)[6]  In fact, a review of the schedules Majapara filed in the bankruptcy appears to show that only five of Majapara's between 1,000 and 5,000 creditors are U.S. entities, with the rest being Mexican creditors.  (See DN 110, Schedule F, incl. Exhibits F-1, F-2 and F-3.)  That means that between 0.5% and 0.02% of Majapara's creditors are U.S. creditors while between 99.5% and 99.98% are Mexican creditors.  Majapara's books and records are also

---

6 In the Illinois litigation, Wachovia has alleged that a U.S. entity, JOM Corporation of Illinois, is the alter ego of Majapara.  Majapara has denied this and claimed that JOM Corporation of Illinois no longer exists as a result of a statutory merger in 2006 with JOM Corporation.  For purposes of the Motion to Dismiss, the parties did not address JOM Corporation or JOM Corporation of Illinois.

located in Mexico.  (TN 17, at 33:10-36:3, 37:11-37:16, 52:15-52:23, 54:16-54:23.)

In addition, the parties agree that, because Majapara has assets and/or has asserted claims in both Mexico and the United States, Majapara will need to pursue a bankruptcy/insolvency case in both Mexico and the United States.  The parties disagree, however, about where the main bankruptcy should have been brought.

Wachovia believes that the proper way for Majapara to achieve the goal of two cases, one in the United States and one in Mexico, is to bring an insolvency action in Mexico (in this case, the CNBV's involuntary complaint suffices) and then seek the appointment of a foreign representative from the Mexican court to come to the United States and file an ancillary proceeding under Chapter 15 of the United States Bankruptcy Code.  See 11 U.S.C. §§ 1501-1532 (particularly §§ 1515-1527) (providing the mechanism for a foreign representative to apply to the United States court for recognition of the foreign proceeding and providing the relief that may be granted upon such recognition).  That would allow Majapara to pursue its claims in the United States.  See id. §§ 1511, 1512.  Given that Majapara's principal place of business is in Mexico, there is little doubt that the United States court would recognize the Mexican case and allow an ancillary proceeding to be brought here.  See id. § 1517 (providing that the court shall recognize a foreign proceeding where the foreign proceeding "is pending in the country where the debtor has the center of its main interests.")  In fact, the exact situation that is present in this case is the reason why, in 2005, the United States adopted Chapter 15, which is based on the Model Law on Cross-Border Insolvency promulgated by the United Nations Commission on International Trade Law ("Model Law").  It is also the reason why Mexico also adopted a similar version of the Model Law in 2000 (codified as Title 12 of the Mexican insolvency statute).  (DN 95, at 19 n.7.)  An ancillary proceeding in the United States, while affording Majapara the

benefits of the Bankruptcy Code, will defer to, be guided by, and be subject to the direction of the Mexican court.

Majapara, however, turned this orderly procedure on its head by filing in the United States rather than in its home country. The purpose behind Majapara's filing in the United States, of course, is to try to avoid as preferences prejudgment attachments Wachovia obtained from Illinois and New York courts. (DN 95, at 8-9.) Majapara, however, cannot achieve this goal. In response to Majapara's adversary complaint in which Majapara seeks a declaration that the prejudgment attachments are preferences, Wachovia has asserted a complete defense to Majapara's preference action under 11 U.S.C. § 546(g), and the Bankruptcy Court has ruled in favor of Wachovia on this issue. (see p. 8 above; TN 33 (Amended Ans. to Adv. Compl.), at 11.) But even if Majapara could avoid the prejudgment attachments (which it cannot), that would not be grounds for turning the Model Law on its head.

To try to achieve coordination between the United States bankruptcy case and the Mexican insolvency case, Majapara is seeking to have the CNBV's Mexican insolvency case converted into a case ancillary to the United States Chapter 11 proceeding. (DN 95, Ex. C, ¶ 7.) Mexican law, however, does not allow the Mexican court to recognize the United States proceeding and, therefore, the CNBV case cannot be converted to an ancillary proceeding.

Under the Model Law, and under the substantively identical provisions of the *Ley de Concursos Mercantiles* (the "Mexican Business Reorganization Act" or the "MBRA") and Chapter 15 of the United States Bankruptcy Code, once a petition for recognition is filed in a foreign court (as Majapara's foreign representative has done in Mexico), the receiving court then looks to the home proceeding (here, the U.S. Bankruptcy Court) to determine whether the action should be recognized as a Principal Foreign Proceeding or a Non-Principal Foreign Proceeding,

- 15 -

as such terms are used in the MBRA.  (DN 117, Ex. E1., Art. 279; <u>see</u> <u>also</u> 11 U.S.C. § 1517.)

Under the MBRA, a Principal Foreign Proceeding is defined as a "Foreign Proceeding pursued

in the State where the Merchant has its principal place of business."  (<u>Id</u>., Art. 279; <u>see</u> <u>also</u> 11

U.S.C. § 1517(b)(1).)   As Majapara's principal place of business is in Mexico and not in the

United States, the case pending in the Northern District of Illinois cannot be deemed a Principal

Foreign Proceeding.

A Non-Principal Foreign Proceeding under the MBRA means a foreign proceeding being

pursued in a State where the Merchant has one of the establishments described in Section VI of

Article 279.  (DN 117, Ex. E1, Art. 279; <u>see</u> <u>also</u> 11 U.S.C. § 1517(b)(2).)  Section VI of Article

279 defines an "establishment" as "any place of operation where the Merchant conducts

economic activities in a non-transitory manner, with human means and goods or services."  (DN

117, Ex. E1, Art. 279.)  Majapara, however, has admitted that it has no establishment or offices

in the United States, (TN 17 (4/16/08 transcript), at 12:3 - 12:5), and, therefore, the Mexican

court cannot recognize the Chapter 11 case as a Non-Principal Foreign Proceeding.

Because the Mexican court cannot recognize the United States proceeding as either a

Principal Foreign Proceeding or a Non-Principal Foreign Proceeding, under Mexican law, the

Mexican court cannot make the Mexican case ancillary to the U.S. proceeding.  (DN 117, Ex.

E1, Art. 296; <u>see</u> <u>also</u> 11 U.S.C. § 1517(a)(1).)   Hence, the Debtor's ancillary proceeding

strategy is flawed.

In the Court below, Majapara argued that Wachovia's argument "is based on a lot of what

ifs:  What if the Mexican court does this; what if the Mexican court does that."  (TN 30 (5/7/08

transcript), at 30:9–30:11.)  Majapara went on to state that "[a]t this point the judge down there

has not made a decision . . . we don't know what's going to happen in Mexico.  Wachovia is

telling you what you should think is going to happen in Mexico." (Id., at 32:18–32:24.)  But at no point did Majapara argue that Wachovia's recitation of Mexican law is incorrect.  In fact, during oral argument, Majapara's counsel stated that, "I think that we are all pretty much in agreement about what Mexican law says and what the process entails.  I think where the disagreement lies is in the propriety of guessing what a court in Mexico is going to do before it does it." (Id., at 5:22-6:1.)  By admitting that the parties are in agreement about what Mexican law says, Majapara admitted that Wachovia's recitation of Mexican law on pages eight to ten of Wachovia's reply brief, (DN 117, at 8-10), is correct and that Mexican law (which is the same as the United State law since both are based on the Model Law) does not allow a Mexican court to convert the CNBV case to a case ancillary to the United States Chapter 11 case.  Majapara, nevertheless, argued that, regardless of what the law is, the Mexican court might decide contrary to its own law.  That is not a sound rationale for bringing its case in the United States.

Furthermore, if the Mexican court does what Majapara concedes the law requires it to do and rejects Majapara's request to convert the CNBV case to a case ancillary to the United States case, there will be two principal cases, one in Mexico and one in the United States, neither coordinating with the other or deferring to the other.  This would create an administrative and procedural nightmare for creditors and the Debtor.

As is stated above, between 99.5% and 99.98% of Majapara's creditors are Mexican creditors.  A review of Exhibits F1 and F2 to Majapara's Amended Schedule F shows that many of these creditors are small creditors owed just a few thousand dollars.  (DN 110, Schedule F, Exs. F1 and F2.)  Separate proceedings in Mexico and the United States will require each of these creditors to either file proofs of claim in both jurisdictions or risk being excluded from a distribution in one of the jurisdictions.  Some Mexican creditors may even need to hire a United

States lawyer to protect their interests in the United States proceeding, something some Mexican creditors have already done.  Such a result, of course, is not efficient for these small creditors who are likely to spend more in fees and/or expenses protecting their rights in the United States and Mexico than they are likely to receive in a distribution.  Indeed, Mexican creditors who do not have the financial wherewithal to participate in a proceeding thousands of miles away and in a foreign country will, effectively, have their voices muted.

Furthermore, having two main proceedings increases the risk that the Mexican Court and United States Court will issue inconsistent rulings or htat one of the Courts will refuse to follow an order of the other Court, which would make it more difficult for creditors to protect their rights and would drive up the cost of the bankruptcy.  Separate main proceedings with two courts deciding on the distribution of assets also increases the risk of an inequitable distribution, with certain creditors receiving more than their pro rata share and some receiving less than their pro rata share, which would not be in the best interest of creditors as a whole.

Having two main proceedings is also inefficient for the Debtor for the reasons stated above.  With two main proceedings, the Debtor will need to spend more money attempting to coordinate its activities between the two main proceedings.  Furthermore, since it is doubtful that orders entered by the United States court will be enforceable in Mexico and vice versa, there will be a lack of clarity over the process and likely increased fees and costs for the Debtor.  See Xacur, 219 B.R. at 969 (noting that the bankruptcy "will not result in an economical and expeditious administration of [debtor's] estate because of the doubtful enforceability of bankruptcy court orders concerning a Mexican citizen and domiciliary in Mexico").

The creditors and Majapara would be better off with a coordinated proceeding with the Mexican Court taking the lead and a United States case being ancillary to the Mexican case,

which is the result Wachovia believes is most efficient.  See Compañia, 376 B.R. at 434 ("[D]eference to foreign insolvency proceedings will, in many cases, facilitate 'equitable, orderly and systematic' distribution of the debtor's assets.") (citations omitted).  Of course, Majapara will argue, and it has already done, that it had no choice but to file in the United States to allow it to avoid the prejudgment attachments.  But, as already stated above, Majapara cannot avoid the prejudgment attachments because of the safe-harbor provision found in 11 U.S.C. § 546(g) and, thus, the Chapter 11 was brought here for no reason.  Furthermore, while the approximately $1.65 million that has been attached in an Illinois bank account is a significant amount of money, given that Wachovia is identified on Majapara's schedules as being the largest unsecured creditor with approximately 49% of the unsecured claims, nearly half of that money would come back to Wachovia anyway even if it was a preference.  (DN 110, Schedule F.)  And given that Majapara has listed $16,332,251.83 in assets, the $1.65 million is certainly not worth the extra costs and administrative effort that will be required of creditors and the Debtor because of Majapara's insistence in bringing the case here rather than in its home country of Mexico.

While Majapara would like to argue that it was merely protecting its creditors by filing in the United States, one fact is unavoidable:  By ignoring the procedures set up under both Mexican and United States law for cross-border cases, Majapara has created an administrative and procedural nightmare that will (if the Mexican court follows Mexican law) cause substantial hardship on 99% of Majapara's creditors.  Thus, in the interest of creditors and the Debtor, this Court should reverse the Bankruptcy Court and order the Bankruptcy Court to dismiss this bankruptcy under 11 U.S.C. § 305(a).  Majapara can then seek the appointment of a foreign representative in the Mexican case to bring an ancillary proceeding here if the foreign representative wishes to do so.

**III.   ALLOWING MAJAPARA TO CONTINUE ITS CHAPTER 11 CASE DEFIES CONGRESSIONAL INTENT TO HAVE CROSS-BORDER INSOLVENCIES COORDINATED FROM THE DEBTOR'S HOME JURISDICTION**

In addition to creating an administrative and procedural nightmare that harms creditors and the Debtor, the Chapter 11 case contravenes United States policy.  In adopting the Model Law in 2005 as part of the Bankruptcy Abuse Prevention and Consumer Protection Act (BAPCPA) amendments, Congress made clear that the exact situation being orchestrated by Majapara was to be avoided and that in such situations dismissal is an appropriate remedy. Addressing 11 U.S.C. § 1529, which is part of Chapter 15 (the codification of the Model Law), Congress noted that:

> This section follows the Model Law almost exactly, but **subsection (4) adds a reference to section 305 to make it clear the bankruptcy court may continue to use that section, as under present law,** *to dismiss* **or suspend a United States case** as part of coordination and cooperation with foreign proceedings. **This provision is consistent with United States policy to act ancillary to a foreign main proceeding whenever possible**.

House Report No. 109-31 (I), at 117 (2005), *reprinted in* 2005 U.S.C.C.A.N. 88, 180 (emphasis added).  Majapara's actions, however, have stymied the United States acting ancillary to the CNBV's insolvency case in Mexico.  Cf. In re Xacur, 219 B.R. 956, 969-70 (Bankr. S.D. Tex. 1998) (dismissing involuntary petition where, among other factors, court found that "the United States is not the appropriate forum" to administer Mexican debtor's estate); Cunard S.S. Co. v. Salen Reefer Servs. AB, 773 F.2d 452, 458 (2d Cir. 1985) ("American courts have consistently recognized the interest of foreign courts in liquidating or winding up the affairs of their own domestic business entities.").

In fact, the absurdity of the United States being the main proceeding here can be seen if one were to consider what would happen if Majapara had assets in many different countries and decided to start ancillary proceedings in many places around the globe.  For example, if

Majapara had assets in Mexico, the United States, Germany, London and France, would it really make sense for a court in the United States to be the forum for the main proceeding and to be responsible for coordinating ancillary cases in Mexico, Germany, London and France?  Of course not.  The proper jurisdiction to coordinate all of those proceedings would be Mexico, where Majapara, its books and records and over 99% of its creditors are located.

If left to stand, the Bankruptcy Court's decision allowing Majapara to continue its case in the United States would set a dangerous precedent.  If Majapara's rationale for filing here is accepted, it would basically be saying that a debtor can forum shop for whatever jurisdiction provides it with the best insolvency law and file there, even though that meant the filing of an *ancillary* proceeding in the debtor's home country.  For example, if Majapara had a small account in the Netherlands and liked the bankruptcy laws there, it would be able to file a bankruptcy in that country and then file an ancillary case in Mexico.  Certainly, such forum shopping should not be permitted and the result should be no different here just because Mexico and the United States border one another.

By all accounts, the Mexican courts are where the main proceeding is proper.  Given "United States policy to act ancillary to a foreign main proceeding whenever possible," (House Report No. 109-31 (I), at 117 (2005), *reprinted in* 2005 U.S.C.C.A.N. 88, 180), the Court should dismiss the United States case, thus allowing Majapara to seek the appointment of a foreign representative in Mexico to file an ancillary case in the United States under Chapter 15 of the Bankruptcy Code.

## IV.  MAJAPARA'S ACTIONS CIRCUMVENT THE RIGHTS OF MEXICAN REGULATORY AUTHORITIES

In addition to being inefficient for creditors and the Debtor and against United States policy, the Chapter 11 proceeding also subverts the rights of Mexican regulators and violates

Mexican public policy.  As described above, Majapara is strictly regulated by various Mexican governmental agencies at every stage of its existence, from life to death.  These regulatory agencies coordinate their efforts with respect to their oversight of Foreign Exchange Brokers such as Majapara.  (DN 22, Ex. E, ¶ 26.)  Indeed, upon the commencement of an insolvency proceeding, the law governing Casas de Cambio (the GLAFOA) provides for the continued regulation of entities like Majapara.  (Id. ¶ 29.)  In fact, the general bankruptcy law in Mexico (the MBRA) expressly recognizes that the supervisory and regulatory authority of the CNBV, and the supplemental scope of authority of the SHCP (Ministry of Finance and Public Credit) and BANXICO (the Mexican Central Bank), continue in insolvency proceedings.  (Id. ¶ 32.)

If Majapara is allowed to proceed with its Chapter 11, the special rights and privileges granted to the CNBV, as well as the authority of the SHCP and BANXICO, in a Mexican insolvency proceeding – rights and privileges that are not recognized in a Chapter 11 case – would be circumvented.  Such rights include the CNBV's right to (i) move for liquidation (as opposed to reorganization), and (ii) select the representatives (conciliator and trustee) who oversee the proceedings at various stages.  (DN 22, Ex. E, ¶¶ 33-37; DN 22, Ex. F, at ¶¶ 51-54.)  Depriving the regulators of such privileges undermines the role Mexican law provides to Mexican agencies charged with regulating and overseeing Mexican institutions engaged in strategic economic activities within the Mexican economy, such as Majapara, to the harm of creditors.  (See DN 22, Ex. E, ¶ 39.)

Dismissal is warranted here where a foreign entity is strictly regulated by its government and where allowing the Chapter 11 to continue would deprive governmental entities from fulfilling their regulatory oversight responsibilities consequently violating Mexican public policy.  Wachovia requests that the Court dismiss Majapara's petition.

## <u>CONCLUSION</u>

For the reasons stated above, as well as for the reasons contained in the record, Wachovia

Bank, National Association requests that the Court reverse the Bankruptcy Court's denial of

Wachovia's Motion For An Order Dismissing Debtor's Chapter 11 Bankruptcy Case, remand the

case to the Bankruptcy Court, and order the Bankruptcy Court to dismiss the Debtor's Chapter

11 Bankruptcy Case with prejudice.

Dated:  July 9, 2008                     Respectfully submitted,

**WACHOVIA BANK, NATIONAL ASSOCIATION**
By:  __/s/Michael S. Leib_____
        One of its attorneys
        Pia N. Thompson (ARDC No. 6225746)
        Michael S. Leib (ARDC No. 6243348)
        Reed Smith LLP
        10 South Wacker Drive, 40th Floor
        Chicago, IL  60606-7484
        Telephone:     (312) 207-1000
        Facsimile:      (312) 207-6400
        Email: mleib@reedsmith.com

# EXHIBIT 1

Westlaw.

Not Reported in F.Supp.                                                                                  Page 1
Not Reported in F.Supp., 1993 WL 169272 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp., 1993 WL 169272 (N.D.Ill.))**

In re Dash
N.D.Ill.,1993.
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern
Division.
In re Bhabesh C. DASH, Debtor-Appellant.
Jagat M. SUBDUHI, Plaintiff-Appellee,
v.
Bhabesh C. DASH, Defendant-Appellant.
**Nos. 92 C 7870, 91 A 1090.**

May 18, 1993.

MEMORANDUM AND ORDER

MORAN, Chief Judge.
**\*1** The debtor is one of nine defendants in a 1989
RICO action in the Southern District of New York.
That action is close to being ready for trial except for
the depositions of the defendants, although the debtor
has, apparently, not been actively involved in the
defense of that action. The voluntary bankruptcy
petition was filed shortly before his deposition was
scheduled and his only significant liabilities relate to
the RICO action. Plaintiff in the New York action
wants to proceed there and he moved before
Bankruptcy Judge Wedoff for a modification of the
automatic stay so as to permit that to happen, and for
a suspension of the adversary proceeding here
pursuant to 11 U.S.C. § 305(a). The debtor opposed
the suspension, contending that he could not afford to
defend in New York and that the only way his
liability could be fairly determined was in the
adversary proceeding here. Judge Wedoff, on
October 19, 1992, suspended the adversary
proceeding "for the reasons stated on the record" and
the debtor appeals.

Two statutory provisions govern abstentions by the
bankruptcy court. One is 28 U.S.C. § 1334(c), which
relates to abstention by the district court and, by
delegation, to the bankruptcy court, although it is
somewhat uncertain whether or not the bankruptcy
court, relying upon that section, can rule in all
instances, with appeal to the district court, or whether
in some instances at least the bankruptcy court is
confined to making a report and recommendation.
The other section is 11 U.S.C. § 305(a), which

permits, in relevant part, the bankruptcy court to
dismiss the case or suspend the proceedings, after
notice and hearing, "if the interest of creditors and
the debtor would be better served by such dismissal
or suspension...." Section 305(a) is applicable here.

We do not doubt that there was an appropriate notice
and hearing here; that the motion was addressed to
the sound discretion of the bankruptcy court; that the
bankruptcy court could consider judicial economy as
a factor (*In re Williams*, 88 B.R. 187 (Bkrptcy,
N.D.Ill.1988)); that the bankruptcy court could
balance the respective interests of the debtor and
creditors in exercising that discretion, with due
regard for the preservation of the bankrupt's estate;
and that this court's standard of review is abuse of
discretion. We do not believe that the bankruptcy
court must find that interests of both debtor and
creditors must be equally served before approving a
suspension.

The real issues here are whether or not Judge Wedoff
exercised his discretion, articulated the reasons for
his decision, and abused his discretion. Before he
ruled, Judge Wedoff contacted the judge in New
York and determined that the case would go forward
there, and soon, against some defendants, regardless
of what happened here. The option, then, was to
require the plaintiff-creditor to proceed both in New
York and here, or to require the debtor to defend in
New York, as best he could, rather than here. Judge
Wedoff chose the latter option. In doing so he
exercised his discretion, he stated his reasons, and we
cannot conclude that he abused his discretion in
reaching the result he did.

**\*2** The appeal is denied.

N.D.Ill.,1993.
In re Dash
Not Reported in F.Supp., 1993 WL 169272 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy
Slip Copy, 2008 WL 906505 (N.D.Cal.)
(Cite as: 2008 WL 906505 (N.D.Cal.))

Page 1

**H**In re Hatfield
N.D.Cal.,2008.
Only the Westlaw citation is currently available.
United States District Court,N.D. California.
In re Richard L. HATFIELD, Debtor.
In re Alliance Financial Capital Holdings, Inc.,
Debtor.
**Nos. C-07-3715 MMC, C-07-3716 MMC.**

March 31, 2008.

Iain A. MacDonald, MacDonald & Associates, San
Francisco, CA, for Debtors.

### ORDER AFFIRMING DECISION OF
### BANKRUPTCY COURT

MAXINE M. CHESNEY, District Judge.
*1 Appellant Jennifer M. Moore's ("Moore") has
filed a notice of appeal in each of the above-titled
actions; by each such notice she appeals the decision,
issued June 26, 2007 by the United States Bankruptcy
Court, Northern District of California, to dismiss the
underlying bankruptcy actions pursuant to
settlement.FN1

> FN1. Although separately filed, the two
> underlying bankruptcy actions were related
> by the Bankruptcy Court on January 11,
> 2007, (see Record on Appeal from
> Dismissal of Involuntary Petition in Case
> No. 07-30031 ("Hatfield ROA") Doc. 2),
> and proceedings were conducted jointly,
> (see, e.g., id.Doc. 12 (Order continuing
> status conference with respect to both
> actions)).

Before the Court are Moore's briefs in support of her
notices of appeal. Appellees First Trust Corporation
fbo Richard L. Spees, First Trust Corporation fbo
J.D. Erickson, and George Rnjak (collectively,
"Petitioners"), have filed a notice of non-participation
in each case. Neither appellee/debtor Richard L.
Hatfield ("Hatfield"), nor appellee/debtor Alliance
Financial Capital Holdings, Inc. ("AFCH"), has filed
a response.

### BACKGROUND

Moore and Hatfield lived together for approximately
thirteen years, during which time they founded and
operated Alliance Financial Capital, Inc. ("AFC"), a
factoring business.FN2(See Hatfield ROA Doc. 3 ¶ 4.)
Moore and Hatfield separated in 2001, and, in
subsequent proceedings regarding the division of
their property, the state court determined Moore and
Hatfield owned equally the property accumulated
while they were together, including AFC. (See
id.)Petitioners are holders of promissory notes issued
by AFCH. (See id.Doc. 13 Cooper Decl. ¶ 1.)

> FN2."Factoring involves the buying of
> accounts receivable at a discount and then
> attempting to collect on these accounts."U.S.
> v. Jordan, 49 F.3d 152, 154 n. 1 (5th
> Cir.1995).

On January 8, 2007, Petitioners filed an involuntary
petition for bankruptcy against Hatfield, (see Hatfield
ROA Doc. 1), and a separate involuntary petition
against AFCH, (see Record on Appeal from
Dismissal of Involuntary Petition in Case No. 07-
30030 ("Alliance ROA") Doc. 1); each of said
petitions was filed pursuant to Chapter 7 of the
Bankruptcy Code. As noted, the two bankruptcy
actions were related by the Bankruptcy Court on
January 11, 2007. (See Hatfield ROA Doc. 2.) On
February 1, 2007, Hatfield filed an answer to the
involuntary petition, (see id.Doc. 4); AFCH did not
file an answer, (see Alliance ROA Doc. 21). On
February 2, 2007, the Bankruptcy Court suspended
the bankruptcy proceedings, pursuant to 11 U.S.C. §
305 (" § 305"), "to permit settlement efforts in the
state court to continue."(See id.Doc. 5 at 2:1-2.) FN3

> FN3. On January 29, 2007, in Bankruptcy
> Case No. 07-30031, Moore removed four
> state court actions to the Bankruptcy Court.
> (See Hatfield ROA No. 3 (Adversary No.
> 07-3011).) The first of said actions was filed
> August 21, 2003 by Moore against Hatfield;
> the second action was filed December 15,
> 2004 by Moore against Hatfield and AFCH,
> among others; the third action was filed
> January 26, 2005 by AFC against Moore and

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

her counsel; and the fourth action was filed December 17, 2001 by Moore against Hatfield. (*See id.* at 2:21-3:7.)

> Also on January 29, 2007, Moore removed two state court actions in Bankruptcy Case No. 07-30030.(*See* Alliance ROA No. 3 (Adversary No. 07-3010).) The first of said actions was filed October 12, 2005 by Moore against Hatfield, AFCH, and approximately seventy other defendants, and the second action was filed April 13, 2006 by Jacqueline Jackson, a creditor of Hatfield and AFCH, against AFC, AFCH, and Hatfield. (*See id.* at 4:4-18.)

> By March 13, 2007, the Bankruptcy Court had remanded all of the above-referenced state court actions. (*See* Hatfield ROA No. 11 at 2:3-5 (noting remand of adversary proceedings 07-3010 and 07-3011 by separate order).) The order of remand is not the subject of the instant appeals.

Thereafter, on May 25, 2007, Petitioners filed a motion to dismiss the two bankruptcy petitions, based on a settlement between "the Alleged Debtors [Hatfield and AFCH], affiliates of AFCH, the Petitioning Creditors and other similarly situated creditors," which settlement had been approved in an oral order made by the state court on May 11, 2007.[FN4](*See id.*Doc. 13 at 1-2.) On May 31, 2007, the state court issued a written order determining the settlement to be in good faith. (*See id.*Doc. 18 Ex. D.) Moore participated in the state court proceedings and asserted therein claims against Hatfield and others, including claims on behalf of AFCH and other corporate entities, but was not a party to the settlement. In determining the settlement to be in good faith, the state court dismissed Moore's "derivative" claims asserted on behalf of AFCH and other corporate entities. (*See id.*)

> FN4. One day later, on May 26, 2007, Moore filed a motion to terminate the suspension of the Hatfield bankruptcy case and noticed her motion for hearing on the same date as Petitioners' motion to dismiss. Moore's motion is directed exclusively to her dissatisfaction with the terms of the

settlement, (*see id.*Doc. 15), and the Bankruptcy Court appears to have considered Moore's motion concurrently with, and as an opposition to, Petitioners' motion to dismiss.

*2 On June 22, 2007, the Bankruptcy Court conducted a hearing on Petitioners' motion to dismiss. (*See id.*Doc. 32.) The Bankruptcy Court granted the motion, and, in so doing, found the notice of the motion was sufficient, (*see id.* at 22:6-13), that the creditors and debtors were better served by the settlement, (*see id.* at 22:14-19, 23:3-7), and that "the interests of the parties are better served ... with allowing these matters to ... be resolved in state court," (*see id.* at 23:22-24). The Bankruptcy Court also noted:

> That Ms. Moore doesn't receive any payment under the settlement of AFCH does not suggest that settlement is not the best approach, because the settlement deals with creditors of that alleged debtor. Her real interest, if any, is in the nature of an equityholder, which is, of course, subordinate to creditors.

(*See id.* at 22:20-25.)The Bankruptcy Court's oral rulings were memorialized in a written order issued June 26, 2007, wherein the Bankruptcy Court granted the motion and dismissed each of the petitions pursuant to § 305(a)(1). (*See id.*Doc. 27).

On July 19, 2007, Moore filed notices of appeal with respect to the dismissal of each of the bankruptcy petitions.

## LEGAL STANDARD

A final order of a bankruptcy court is appealable to a district court. *See*28 U.S.C. § 158(a)(1). In reviewing a final order of a bankruptcy court, a district court reviews the bankruptcy court's factual findings for clear error and its conclusions of law de novo. *See Diamant v. Kasparian (In re Southern Cal. Plastics, Inc.), 165 F.3d 1243, 1245 (9th Cir.1999).* Because dismissal under § 305 is discretionary, the bankruptcy court's decision to dismiss under § 305 should be reversed only upon an abuse of discretion. *See In re Bailey's Beauticians Supply Co., 671 F.2d 1063, 1067 (7th Cir.1982).*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2008 WL 906505 (N.D.Cal.)
**(Cite as: 2008 WL 906505 (N.D.Cal.))**

Page 3

## DISCUSSION

Moore contends dismissal under § 305 was improper because the settlement on which the dismissal was based did not treat equally Moore's interests with those of other creditors, notice of the hearing on the motion to dismiss was inadequate, and the settlement was contingent on the occurrence of future events, including the payment of settlement funds. Additionally, with respect to AFCH, Moore asserts the Bankruptcy Court should have entered a default based on AFCH's failure to submit a timely response to the petition.

Section 305, titled "Abstention," permits the court, "after notice and a hearing," to dismiss or suspend proceedings in an action "at any time if ... the interests of creditors and the debtor would be better served by such dismissal or suspension."*See*11 U.S.C. § 305(a)."Whether to dismiss or suspend under section 305(a)(1) is ... a discretionary decision to be made on a case-by-case basis."*In re International Zinc Coatings & Chemical Corp.*, 355 B.R. 76, 82 (Bankr.N.D.Ill.2006). Because abstention is "an extraordinary remedy," *see In re Eastman,* 188 B.R. 621, 624 (9th Cir.BAP1995), "dismissal is appropriate under § 305(a)(1) only in the situation where the court finds that both creditors and the debtor would be better served by a dismissal,"*see id.*(internal quotation and citation omitted).

**\*3** Moore first contends dismissal was not in her interest, as a creditor of Hatfield, (*see* Opening Brief at 8:27-28), because she was not a party to the underlying settlement, and would not receive payment, whereas other creditors, parties to the settlement, would receive payment. Even assuming Moore were a creditor of Hatfield, Moore's argument is unavailing. Dismissal under § 305 is appropriate "where the petitioning [creditor is] attempting to use the Bankruptcy Court as an alternative to proceeding with pending State Court litigation to resolve what is essentially a two-party dispute."*See In re Kass,* 114 B.R. 308, 309 (Bankr.S.D.Fla.1990). Here, the Bankruptcy Court found the Hatfield bankruptcy case was "in the nature of a two-party dispute between [ ] Hatfield and his former spouse-like person" and that such dispute was "best dealt with in the ongoing state court action."(*See* Hatfield ROA Doc. 32 at 23:8-13.); *see also In re Kass,* 114 B.R. at 309 (holding

dismissal under § 305 should be granted "where the Court finds that the petitioning creditors have adequate State law remedies") (citation omitted)).[FN5]

> FN5. To the extent Moore suggests dismissal was not in her interest as a general creditor of AFHC, Moore's premise is faulty. Moore's claims against AFHC were not those of a creditor; rather, as the Bankruptcy Court recognized, Moore's interest was "in the nature of an equityholder."(*See* Hatfield ROA Doc. 32 at 22:23-25.)

Moore's second argument, that notice of the dismissal hearing was inadequate, likewise is unpersuasive. On May 25, 2007, Petitioners' filed a "Notice of Hearing on Motion to Dismiss Involuntary Petitions on Consent of Petitioning Creditors and Debtors," wherein petitioners noticed their motion to dismiss for hearing on June 22, 2007. (*See* Hatfield ROA Doc. 14.) Petitioners served such notice, along with the motion and supporting declarations, on Moore's counsel, as well as on counsel for Hatfield and AFCH, counsel for eight other individuals or entities, approximately twenty-five unrepresented creditors, and the United States Trustee. (*See id.*)The Bankruptcy Court found service had been effectuated "on everybody who has shown any interest in this case."(*See id.*Doc. 32 at 22:11-12.) Moore does not assert she was prejudiced in any way by the manner in which the hearing was noticed, nor that any particular interested party failed to receive notice. Under the circumstances presented, notice of the dismissal hearing was sufficient. *See, e.g., Buffington v. First Service Corp.,* 672 F.2d 678, 689-90 (8th Cir.1982) (holding, where "interested persons" received notice, such notification satisfied notice requirement of § 305(a)(1)).

Moore next argues that the Bankruptcy Court should not have dismissed the petition because the settlement agreement was conditioned on payment of settlement funds and/or other future occurrences. Again, Moore's argument is unpersuasive. In the event the settlement agreement is breached, the injured party can seek recourse for such breach of contract in the appropriate forum. *See Hinduja v. Arco Products Co.,* 102 F.3d 987, 989-90 (9th Cir.1996) (holding both state and federal court had jurisdiction to enforce settlement agreement upon

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2008 WL 906505 (N.D.Cal.)
(Cite as: 2008 WL 906505 (N.D.Cal.))

which bankruptcy dismissal was based); *see also In re Valdez Fisheries Dev. Ass'n, Inc.,* 439 F.3d 545, 549 (9th Cir.2006) (holding, absent explicit retention of jurisdiction over settlement by bankruptcy court or court's incorporation of settlement terms in order of dismissal, "enforcement of the settlement agreement is for state courts").

*\*4* Lastly, relying on § 303(h) and *In re Key,* 209 B.R. 737, 739 (10th Cir.BAP1997), Moore argues that the Bankruptcy Court was required to enter an order for relief against AFCH, based on its failure to submit a timely response to the petition. Section 303(h) provides: "If the petition is not timely controverted, the court shall order relief against the debtor in an involuntary case under the chapter under which the petition was filed."*See* 11 U.S.C. § 303(h). Despite such statute's use of what appears to be mandatory language, however, the Court is not persuaded that the Bankruptcy Court automatically loses the authority to take any action other than entry of an order for relief. In particular, the Court notes that a debtor's failure to file a timely response is also addressed by Rule 1013 of the Federal Rules of Bankruptcy Procedure, which uses language similar to that of § 303(h).*See* Fed.R.Bankr.P. 1013(b) ("If no pleading or other defense to a petition is filed within the time provided by Rule 1011, the court, on the next day, or as soon thereafter as practicable, shall enter an order for the relief requested in the petition.")).[FN6] The Advisory Committee Notes thereto nonetheless envision instances in which an order for relief will not be issued. *See id.* Advisory Committee Notes ("If an order for relief is not entered on default, dismissal will ordinarily be appropriate but the court may postpone definitive action."); *see also* 2 Collier on Bankruptcy ¶ 303.10[3] (Lawrence P. King ed., 15th ed. rev.1997) (discussing § 303(h) and Rule 1013(b); noting if answer not timely filed, answering party *"may be estopped from contesting the involuntary petition at a later date"*) (emphasis added). Indeed, the case on which Moore relies does not foreclose all possibility of the Court's taking action other than an order for relief. *See In re Key,* 209 B.R. at 739 (noting bankruptcy court "ha[d] never acted on the [debtor's] untimely motion for leave to answer out of time"). Accordingly, the Court finds the Bankruptcy Court was not required to enter an order for relief against AFCH, particularly where, as here, the petitioning creditors did not seek such an order.

FN6. Rule 1011 requires "defenses and objections to the petition" to be "filed and served within 20 days after service of the summons."*See* Fed.R.Bankr.P. 1011(b). The one exception to such rule is not applicable here. *See id.*

## CONCLUSION

For the reasons stated above, the decision of the Bankruptcy Court is hereby AFFIRMED.

**IT IS SO ORDERED.**

N.D.Cal.,2008.
In re Hatfield
Slip Copy, 2008 WL 906505 (N.D.Cal.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

H.R. REP. 109-31(I)                                                                                    Page 1
H.R. REP. 109-31(I), H.R. Rep. No. 31(I), 109TH Cong., 1ST Sess. 2005, 2005 U.S.C.C.A.N. 88, 2005 WL 832198
(Leg.Hist.)
**(Cite as: H.R. REP. 109-31(I), 2005 U.S.C.C.A.N. 88)**

P.L. 109-8, **\*1 \*\*88**  BANKRUPTCY ABUSE PREVENTION AND CONSUMER
PROTECTION ACT OF 2005

DATES OF CONSIDERATION AND PASSAGE

House: April 14, 2005
Senate: February 1, 8, March 1-4, 7-10, 2005
Cong. Record Vol. 151 (2005)

House Report (Judiciary Committee)
No. 109-31 (Part 1), April 8, 2005
[To accompany S. 256]

HOUSE REPORT NO. 109-31(I)
April 8, 2005

Mr. Sensenbrenner, from the Committee on the Judiciary, submitted the following

REPORT

[To accompany S. 256]

    The Committee on the Judiciary, to whom was referred the bill (S. 256) to amend
title 11 of the United States Code, and for other purposes, having considered the
same, reports favorably thereon without amendment and recommends that the bill do
pass.

CONTENTS

                                                                    Page
Purpose and Summary ...................................... 2
Background and Need for the Legislation .................. 3
Hearings ................................................ 22
Committee Consideration ................................. 22
Votes of the Committee .................................. 22
Committee Oversight Findings ............................ 33
New Budget Authority and Tax Expenditures ............... 33
Congressional Budget Office Cost Estimate ............... 33
Performance Goals and Objectives ........................ 47
Constitutional Authority Statement ...................... 47
Section-by-Section Analysis and Discussion .............. 47
Changes in Existing Law Made by the Bill, as Reported ... 155
Committee Jurisdiction Letters .......................... 370
Markup Transcript ....................................... 373
Dissenting Views ........................................ 537
Additional Dissenting Views ............................. 591
Additional Minority Views ............................... 597

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

proceeding. [FN160] In a full bankruptcy case, the United States bankruptcy court generally has jurisdiction over assets outside the United States. Here that jurisdiction is limited where those assets are controlled by another recognized proceeding, if it is a main proceeding.

The court may use <u>section 305</u> of this title to dismiss, stay, or limit a case as necessary to promote cooperation and coordination in a cross-border case. In addition, although the jurisdictional limitation applies only to United States bankruptcy cases commenced after recognition of a foreign proceeding, the court has ample authority under the next section and <u>section 305</u> to exercise its discretion to dismiss, stay, or limit a **180 United States case filed after a petition for recognition of a foreign main proceeding has been filed but before it has been approved, if recognition is ultimately granted.

Sec. 1529. Coordination of a case under title 11 and a foreign proceeding. This section follows the Model Law almost exactly, but subsection (4) adds a reference to <u>section 305</u> to make it clear the bankruptcy court may continue to use that section, as under present law, to dismiss or suspend a United States case as part of coordination and cooperation with foreign proceedings. [FN161] This provision is consistent with United States policy to act ancillary to a foreign main proceeding whenever possible.

*118 Sec. 1530. Coordination of more than one foreign proceeding. This section follows article 30 of the Model Law exactly. [FN162] It ensures that a foreign main proceeding will be given primacy in the United States, consistent with the overall approach of the United States favoring assistance to foreign main proceedings.

Sec. 1531. Presumption of insolvency based on recognition of a foreign main proceeding. This section follows the Model Law exactly, inserting a reference to the standard for an involuntary case under this title. [FN163] Where an insolvency proceeding has begun in the home country of the debtor, and in the absence of contrary evidence, the foreign representative should not have to make a new showing that the debtor is in the sort of financial distress requiring a collective judicial remedy. The word "proof" in this provision here means "presumption." The presumption does not arise for any purpose outside this section.

Sec. 1532. Rule of payment in concurrent proceeding. This section follows the Model Law exactly and is very similar to prior section 508(a), which is repealed. The Model Law language is somewhat clearer and broader than the equivalent language of prior section 508(a). [FN164]

Sec. 802. Other Amendments to Titles 11 and 28, United States Code. Section 802(a) amends <u>section 103</u> of the Bankruptcy Code to clarify the provisions of the Code that apply to chapter 15 and to specify which portions of chapter 15 apply in cases under other chapters of title 11. Section 802(b) amends the Bankruptcy Code's definitions of foreign proceeding and foreign representative in <u>section 101</u>. The new definitions are nearly identical to those contained in the Model Law but add to the phrase "under a law relating to insolvency" the words "or debt adjustment." This addition emphasizes that the scope of the Model Law and chapter 15 is not limited to proceedings involving only debtors which are technically insolvent, but broadly includes all proceedings involving debtors in severe financial distress, so long as those proceedings also meet the other criteria of <u>section 101(24)</u>. [FN165]

Section 802(c) amends <u>section 157(b)(2) of title 28</u> to provide that proceedings under chapter 15 will be core proceedings while other amendments to <u>title 28</u> provide that the United States trustee's standing extends to cases under chapter 15 and that the United States trustee's duties include acting in chapter 15 cases. Although the United States will continue to assert worldwide jurisdiction over property of a domestic or foreign debtor in a full bankruptcy case under chapters 7 and 13 of this title, subject to deference to foreign proceedings under chapter 15

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Westlaw.

PL 101-650, 1990 HR 5316                                                    Page 1
PL 101-650, December 1, 1990, **104 Stat 5089**
**(Cite as: 104 Stat 5089)**

**UNITED STATES PUBLIC LAWS**
**101st Congress - Second Session**
**Convening January 23, 1990**

Copr. © West 1990 No Claim to Orig. Govt. Works

Additions and Deletions are not identified in this document.
For Legislative History of Act, see LH database or Report for
this Public Law in U.S.C.C. & A.N. Legislative History section.

PL 101-650 (HR 5316)
December 1, 1990
JUDICIAL IMPROVEMENTS ACT OF 1990

AN ACT to provide for the appointment of additional Federal circuit and district judges, and for other purposes.

Be it enacted by the Senate and House of Representatives of the United States
of America in Congress assembled.

<< 28 USCA § 1 NOTE >>

That this Act may be cited as the "Judicial Improvements Act of 1990".

TITLE I--CIVIL JUSTICE EXPENSE AND DELAY REDUCTION PLANS

<< 28 USCA § 1 NOTE >>

SEC. 101. SHORT TITLE.

This title may be cited as the "Civil Justice Reform Act of 1990".

<< 28 USCA § 471 NOTE >>

SEC. 102. FINDINGS.

The Congress makes the following findings:

(1) The problems of cost and delay in civil litigation in any United States district court must be addressed in the context of the full range of demands made on the district court's resources by both civil and criminal matters.

(2) The courts, the litigants, the litigants' attorneys, and the Congress and the executive branch, share responsibility for cost and delay in civil litigation and its impact on access to the courts, adjudication of cases on the merits, and the ability of the civil justice system to provide proper and timely judicial relief for aggrieved parties.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

PL 101-650, 1990 HR 5316                                                                    Page 29
PL 101-650, December 1, 1990, **104 Stat 5089**
**(Cite as: 104 Stat 5089)**

(2) by striking out the third sentence and inserting in lieu thereof the following: "Thereafter, either the district court judge or the magistrate may again advise the parties of the availability of the magistrate, but in so doing, shall also advise the parties that they are free to withhold consent without adverse substantive consequences.".

<< 28 USCA § 631 >>

(b) EXTENSION OF TERMS OF OFFICE OF MAGISTRATES.--Section 631(f) of title 28, United States Code, is amended by striking out "60" and inserting in lieu thereof "180".

**\*5113** SEC. 309. APPEAL OF CERTAIN DETERMINATIONS RELATING TO BANKRUPTCY CASES.

<< 11 USCA § 305 >>

(a) ABSTENTION DETERMINATIONS UNDER TITLE 11, UNITED STATES CODE.--Section 305(c) of title 11, United States Code, is amended by inserting before the period the following: "by the court of appeals under section 158(d), 1291, or 1292 of this title or by the Supreme Court of the United States under section 1254 of this title".

<< 28 USCA § 1334 >>

(b) ABSTENTION DETERMINATIONS UNDER TITLE 28, UNITED STATES CODE.--The second sentence of section 1334(c)(2) of title 28, United States Code, is amended--

(1) by inserting "or not to abstain" after "to abstain", and

(2) by inserting the following before the period: "by the court of appeals under section 158(d), 1291, or 1292 of this title or by the Supreme Court of the United States under section 1254 of this title".

<< 28 USCA § 1452 >>

(c) REMAND DETERMINATIONS UNDER TITLE 28, UNITED STATES CODE.--The second sentence of section 1452(b) of title 28, United States Code, is amended by inserting the following before the period: "by the court of appeals under section 158(d), 1291, or 1292 of this title or by the Supreme Court of the United States under section 1254 of this title".

SEC. 310. SUPPLEMENTAL JURISDICTION.

<< 28 USCA § 1367 >>

(a) GRANT OF JURISDICTION.--Chapter 85 of title 28, United States Code, is amended by adding at the end thereof the following new section:

"§ 1367. Supplemental jurisdiction

"(a) Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.